UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STEVEN DARBY MCDONALD,

              Plaintiff,

    v.

KENNETH B. LAUREN, et al.,

              Defendants.

CASE NO. 3:17-CV-05013-RBL-DWC

REPORT AND RECOMMENDATION

Noting Date: May 17, 2019

       The District Court has referred this action, filed pursuant to 42 U.S.C. § 1983, to United States Magistrate Judge David W. Christel. Pending before the Court is Defendants' Motion for Summary Judgment ("Motion"). Dkt. 177.[1]

       After review of the Motion and relevant record, the Court finds Plaintiff Steven Darby McDonald has failed to overcome Defendants' showing that there are no genuine issues of

---

[1] The Motion was filed on behalf of Defendants John Campbell, Steven Hammond, Robert Herzog, Michael Holthe, Steven Jewitt, Edith Kroha, Kenneth Lauren, Peter Maxson, and Tim Thrasher. Dkt. 177. Since Defendants filed the Motion, the Court substituted Defendant Areig Awad in her official capacity for the official capacity claims against Defendant Lauren. Dkt. 233. Because Defendant Awad is merely substituted for the official capacity claims against Defendant Lauren, Defendants assert – and the Court agrees – the Motion's analysis applies to the claims against Defendant Awad, as well. *See* Dkt. 230.

1   material fact remaining in this case. Accordingly, the Court recommends Defendants' Motion

2   (Dkt. 177) be granted. The Court also finds Plaintiff has not properly substituted a successor for

3   Defendant Lauren following Defendants' filing of the Statement Noting Death of Kenneth

4   Lauren and has not properly stated a claim for relief which can be granted as to Defendant Awad.

5   Thus, the Court recommends the claims against Defendants Lauren and Awad be dismissed.[2]

6        Additionally, Plaintiff has an interlocutory appeal currently pending before the Ninth

7   Circuit in this case. *See* Dkt. 223, 231, 235, 245. As such, the Court recommends the Honorable

8   Ronald B. Leighton, the District Judge assigned to this case, enter an order on this Report and

9   Recommendation following the Ninth Circuit's decision and issuance of a mandate following the

10  current appeal. Because the Court finds this case should be dismissed, the Court will decline to

11  consider any documents filed by the parties other than objections to this Report and

12  Recommendation.

13  **I.      Background**

14       Plaintiff filed this action on January 8, 2017. Dkt. 1. Plaintiff alleges he is receiving

15  inadequate treatment for his liver condition. Dkt. 4. Specifically, he alleges he did not receive

16  proper diagnostic testing for his cirrhotic liver and has been removed from narcotic pain

17  management for his chronic pain. *Id*. He states because of his liver condition he cannot take non-

18  steroid anti-inflammatory drugs ("NSAIDs"), and so Defendants, by continually denying

19  Plaintiff's narcotic pain management, have been deliberately indifferent to his serious medical

20  need. *Id*. Plaintiff also alleges Defendants have failed to place him on the list to receive a liver

21  transplant. *Id*. Further, Plaintiff alleges Defendants gave him inadequate medical care in

22  

23       [2] Also pending in this matter before Judge Leighton are Plaintiff's Motion to Modify Pursuant to Rule 72(a)
    and 28 US.C.. § 636 (Dkt. 227), and objections to a Report and Recommendation on two other motions from
24  Plaintiff (Dkt. 244, 246).

1 retaliation for his failure to remove unflattering information about Defendants from a website he

2 began publishing in 2010. *See id.*

3       Plaintiff contracted Hepatitis C in 1976. Dkt. 4, p. 7. It is undisputed that Plaintiff has

4 received care for his Hepatitis C while in custody. *See* Dkt. 177, pp. 2-13 (Defendants' recitation

5 of Plaintiff's treatment while in custody). While in custody, in 2015, Plaintiff was treated with an

6 antiviral medication that eradicated his Hepatitis C virus. *See* Dkt. 58, Kroha Decl., ¶ 4.

7 However, though his Hepatitis C virus was eradicated, it is undisputed Plaintiff still suffers from

8 significant liver damage. *See, e.g.*, Dkt. 58-1, p. 2.

9       In the Motion, Defendants argue Plaintiff has received adequate medical care while in

10 custody. Dkt. 177. They also argue the decision to remove Plaintiff from narcotics was justified

11 and that he was denied a liver transplant because his current symptoms preclude him from

12 acquiring a liver transplant. *Id*. Defendants maintain Plaintiff has failed to show that any actions

13 taken against him were in retaliation to any of Plaintiff's protected conduct. *Id*. Moreover, they

14 assert all Defendants are entitled to qualified immunity. *Id*.

15       On October 20, 2018, Plaintiff filed a Response to the Motion. Dkt. 190. With the

16 Response, Plaintiff included several exhibits as evidence to contradict Defendants' arguments

17 that he is receiving adequate care. *Id*. On January 4, 2019, Defendants filed a Reply. Dkt. 204.

18 As a result of a remand from the Ninth Circuit in this case, the Motion became ready for this

19 Court's consideration on April 5, 2019. *See* Dkt. 200, 217, 222.

20 **II.**    **Standard of Review**

21       Summary judgment is proper only if the pleadings, discovery, and disclosure materials on

22 file, and any affidavits, show that there is no genuine dispute as to any material fact and that the

23 movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is

24

1   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

2   showing on an essential element of a claim in the case on which the nonmoving party has the

3   burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of

4   fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for

5   the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

6   (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

7   metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a

8   material fact exists if there is sufficient evidence supporting the claimed factual dispute,

9   requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby,*

10  *Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

11  626, 630 (9th Cir. 1987).

12  **III.     Discussion**

13          A.   <u>Deceased Defendant</u>

14          On February 13, 2018, Defendants filed a Statement Noting the Death of Defendant

15  Kenneth Lauren. Dkt. 135. Plaintiff moved to substitute the Department of Corrections ("DOC")

16  for Defendant Lauren. Dkt. 138. The Court denied Plaintiff's request to substitute the DOC for

17  Defendant Lauren, but gave Plaintiff until March 12, 2019 to file a subsequent motion to

18  substitute. Dkt. 220. The Court also substituted Defendant Awad for Defendant Lauren in his

19  official capacity. *See id.*; Dkt. 233.

20          1.   *Individual Capacity*

21          Pursuant to Rule 25 of the Federal Rules of Civil Procedure, "[a] motion for substitution

22  may be made by any party or by the decedent's successor or representative. If the motion is not

23  made within 90 days after service of a statement noting the death, the action by or against the

24

1  decedent must be dismissed." Here, Plaintiff filed a motion to substitute within 90 days of the

2  Statement Noting the Death of Defendant Kenneth Lauren. *See* Dkt. 138, 220. Plaintiff, however,

3  did not name a proper party to be substituted; therefore, his motion to substitute was denied. *See*

4  Dkt. 220. Because the Court denied Plaintiff's motion to substitute after the 90-day period

5  expired, the Court gave Plaintiff an extension of time, or until March 12, 2019, to attempt to

6  substitute the proper party for Defendant Lauren, in his individual capacity. *Id.* Plaintiff has not

7  filed a subsequent motion to substitute. Plaintiff also did not request additional time to conduct

8  discovery to attempt to identify Defendant Lauren's successor, nor would a request at this

9  juncture be timely. At most, Plaintiff has requested Court-appointed counsel, which the Court

10 has denied. *See* Dkt. 233. As Plaintiff has not filed a motion to substitute within the extended

11 period provided by the Court, and more than fourteen months have passed since Defendants'

12 filed the Statement Noting the Death of Defendant Kenneth Lauren, the Court recommends

13 Defendant Lauren be dismissed from this action. *See In re Phenylpropanolamine (PPA) Prod.*

14 *Liab. Litig.*, 2006 WL 889553, at *2 (W.D. Wash. Mar. 29, 2006) (finding dismissal under Rule

15 25 appropriate where the plaintiff failed to obtain substitution within the prescribed time and

16 failed to demonstrate excusable neglect for the failure to timely obtain substitution); *In re Brand*,

17 545 B.R. 37, 44 (Bankr. C.D. Cal. 2016) (finding the burden was on the plaintiff take appropriate

18 action to prosecute the action against the decedent's estate by filing an appropriate motion).

19            2.  *Official Capacity*

20       On February 19, 2019, after determining the Medical Director of Monroe Correctional

21 Complex should be substituted for any official capacity claims Plaintiff alleged against

22 Defendant Lauren, the Court directed Defendants to provide the name of the Medical Director of

23 Monroe Correctional Complex. Dkt. 220. Defendants provided the name of the current Facility

24

1    Medical Director of the Monroe Correctional Complex, Dkt. 230, and, on March 19, 2019, the

2    Court directed the Clerk to substitute Facility Medical Director of the Monroe Correctional

3    Complex Dr. Areig Awad, in her official capacity, for Dr. Kenneth Lauren, in his official

4    capacity. Dkt. 233.

5        The Eleventh Amendment prohibits suits for monetary damages against a State, its

6    agencies, and state officials acting in their official capacities. *Aholelei v. Dep't of Public Safety*,

7    488 F.3d 1144, 1147 (9th Cir. 2007). As Defendant Awad is sued only in her official capacity,

8    Plaintiff is limited to injunctive relief for the claims alleged against Defendant Awad. *See Will v.*

9    *Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989) (citing Eleventh Amendment considerations

10   and holding that § 1983 does not permit suits for damages against states); *see also Thornton v.*

11   *Brown*, 757 F.3d 834, 839 (9th Cir. 2013) (finding claims against individuals in their official

12   capacity are limited to injunctive relief); *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836,

13   839 (9th Cir. 1997) (holding that "state officials sued in their official capacities are not 'persons'

14   within the meaning of § 1983" except when "sued for *prospective injunctive relief* ").

15       In the Complaint, Plaintiff requests relief in the form of appointment of medical experts

16   and counsel to assist with his lawsuit and an award of monetary damages. Dkt. 4, p. 4. Plaintiff

17   does not request prospective injunctive relief. *See id*. Plaintiff is, therefore, only seeking

18   monetary relief against Defendant Awad. As Plaintiff may not bring a suit for monetary damages

19   against Defendant Awad in her official capacity, the Court recommends Defendant Awad be

20   dismissed. *See Oliver v. Adams*, 2016 WL 7426111, at *8 (E.D. Cal. Dec. 22, 2016)

21   (recommending dismissal of all claims for monetary damages against defendants in their official

22   capacities).

23       B.  Claims Barred Pursuant to the Statute of Limitations

24

1    Defendants argue some of Plaintiff's allegations fall outside of the statute of limitations.

2    Dkt. 177. Section 1983 does not itself contain a statute of limitations. Rather, federal courts

3    apply the forum state's personal injury statute of limitations to § 1983 claims. *See Wilson v.*

4    *Garcia*, 471 U.S. 261, 276 (1985). A three-year statute of limitations applies in Washington.

5    RCW 4.16.080; *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1058 (9th Cir. 2002). The

6    statute of limitations begins to run in a § 1983 action when a plaintiff knows or has reason to

7    know of the injury which is the basis of his or her action. *Bagley v. CMC Real Estate Corp.*, 923

8    F.2d 758, 760 (9th Cir. 1991). Here, Plaintiff filed this suit on January 8, 2017. Dkt. 1. Thus, any

9    claims that accrued before January 8, 2014 are presumptively time barred.

10    Plaintiff has included several paragraphs in his complaint describing events between

11    January 2010 and December 2013. *See* Dkt. 4, pp. 19-21. Those events occurred more than three

12    years before Plaintiff filed this action. Therefore, any claims arising from the events between

13    January 2010 and December 2013 are barred by the statute of limitations unless Plaintiff can

14    show he is entitled to a tolling period.

15    The Court applies the forum state's law regarding equitable tolling for actions arising

16    under § 1983. *Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004). In Washington State, courts

17    permit equitable tolling "when justice requires." *Millay v. Cam*, 135 Wash.2d 193, 206 (1998).

18    "The predicates for equitable tolling are bad faith, deception, or false assurances by the

19    defendant and the exercise of diligence by the plaintiff." *Id.* Courts "typically permit equitable

20    tolling to occur only sparingly, and should not extend it to a garden variety claim of excusable

21    neglect." *State v. Robinson*, 104 Wash.App. 657, 667 (2001) (internal quotations omitted).

22    Washington State also allows for a tolling period if a person is incompetent or disabled to such a

23    degree that he or she cannot understand the nature of the proceedings. *See* R.C.W. § 4.16.190; *see*

24

1   *also Williams v. Holevinski*, 2006 WL 2167105, *2 (E.D. Wash. July 31, 2006). "A plaintiff . . .

2   carries the burden of proof if he alleges that the statute was tolled and does not bar the claim."

3   *Pope v. McComas*, 2011 WL 1584213, at *7 (W.D. Wash. Mar. 10, 2011), *report and*

4   *recommendation adopted*, 2011 WL 1584200 (W.D. Wash. Apr. 26, 2011).

5          Plaintiff has provided no argument addressing why he did not seek redress of those

6   allegations before the statute of limitations had expired. *See* Dkt. 190. Therefore, insofar as

7   Plaintiff attempts to raise any constitutional claims based on the events predating January 8,

8   2014, those claims are barred by the statute of limitations. Accordingly, the Court recommends

9   those claims be dismissed.

10         C.  Medical Deliberate Indifference Claims

11         Plaintiff alleges Defendants violated his Eighth Amendment rights when they failed to

12  provide adequate diagnostic testing for his liver condition, failed to provide adequate pain

13  management, and failed to provide him with a liver transplant. *See* Dkt. 4, pp. 7-18. "Deliberate

14  indifference to serious medical needs of prisoners constitutes the unnecessary and wanton

15  infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation omitted); *see*

16  *Hudson v. McMillan*, 503 U.S. 1, 6 (1992). An Eighth Amendment medical claim has two

17  elements: (1) "the seriousness of the prisoner's medical need and [(2)] the nature of the

18  defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991),

19  *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en

20  banc).

21         A medical need is serious "if the failure to treat the prisoner's condition could result in

22  further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974

23  F.2d at 1059 (*quoting Estelle*, 429 U.S. at 104). If a plaintiff shows he suffered from a serious

24

medical need, he must then show the prison officials responded to the need with deliberate indifference. *See Farmer*, 511 U.S. at 834. Deliberate indifference to a prisoner's serious medical need requires "a purposeful act or failure to act on the part of the defendant." *McGuckin*, 974 F.2d at 1060. In other words, "[a] defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need." *Id.* A prison official, accordingly, will not be found deliberately indifferent to a prisoner's serious medical needs "unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Further, a difference of opinion between an inmate and medical authorities regarding proper medical treatment does not give rise to a § 1983 claim. *Franklin v. Oregon, State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981).

Defendants do not dispute, for purposes of this Motion, that Plaintiff suffers from a serious medical need. *See generally* Dkt. 177. Thus, the Court's analysis will focus on whether Defendants knew of Plaintiff's medical need, yet deliberately failed to treat it.

### 1. Failure to Provide Diagnostic Testing

#### a. Evidence in Plaintiff's Verified Complaint

Plaintiff alleges Defendants failed to provide him with diagnostic testing on his liver to determine the cause of his chronic pain. Dkt. 4, p. 9. Because Plaintiff's Complaint was filed under penalty of perjury, the Court treats it as evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & n.10 (9th Cir. 1995) (finding complaint signed under penalty of perjury constituted admissible evidence).

In his verified Complaint, Plaintiff provided testimony that Defendant Lauren failed to provide him any diagnostic testing, even after being informed that his primary care provider,

Non-Party Dr. Phu Ngo, failed to provide treatment. *Id*. at p. 11. Moreover, Plaintiff states Non-Party Dr. Diego Lopez de Castilla, who Plaintiff saw for treatment in March of 2016, found Plaintiff could have a "Sphincter of Oddi Disorder," requiring an endoscopic retrograde cholangio-pancreatography ("ERCP"). *Id*. However, Plaintiff states Defendants failed to provide the ERCP. *Id.*.

b.   Other Evidence in the Record

The undisputed evidence indicates Plaintiff was transferred to Monroe Correctional Complex ("MCC") in March 2016, where Defendant Lauren was the medical director. *See* Dkt. 57-1, p. 7. Plaintiff produced evidence showing he sent a letter to Defendant Lauren on March 24, 2016, indicating he needed additional treatment, including diagnostic testing, because his primary care provider had "only ordered blood tests" rather than providing any other care. Dkt. 48-3, p. 25. Defendant Lauren responded by kite to Plaintiff, informing Plaintiff that he should refer to his primary care provider with any concerns. *Id*. at p. 24. Defendant Lauren wrote, "[prior] to any further evaluation of [Plaintiff's] liver function or need for transplantation," Plaintiff's case would have to be heard by the Care Review Committee ("CRC"). *Id*. He also stated Plaintiff could request a referral to Dr. Lopez, an infectious disease specialist, if necessary. *Id*. On March 31, 2016, Plaintiff had an appointment with Dr. Lopez, who wrote on a DOC form that Sphincter of Oddi disorder "may be a possibility." Dkt. 48-2. But Dr. Lopez went on to write that, considering Plaintiff's most recent ultrasound, Plaintiff did not meet the "diagnostic criteria" for a Sphincter of Oddi diagnosis or require additional Sphincter of Oddi diagnostic testing. Dkt. 48-2, p. 35. The record reflects Plaintiff was transferred away from MCC, and therefore away from Defendant Lauren's care, on May 31, 2016. Dkt. 48-2, p. 52.

Plaintiff alleges Defendants unlawfully denied him an ERCP exam, an exam he maintains can be used to diagnose issues with the common bile duct. *See* Dkt. 4, pp. 11-12. Yet Plaintiff has received numerous examinations throughout his incarceration that took note of the dilation of his common bile duct. The record reflects between 2011 and 2015, Plaintiff received at least 10 ultrasound or CT examinations. Dkt. 48-3, pp. 37-50. In December of 2014, Plaintiff underwent a CT scan which showed his common bile duct dilated to 18 mm. Dkt. 48-3, p. 37. The report noted that, although a dilated bile duct is not uncommon for individuals like Plaintiff who have had their gallbladders removed, the 18 mm dilation was "greater than expected." *Id.* In December of 2015, Plaintiff underwent an ultrasound which showed his common bile duct was 2 mm in diameter. *Id.* at p. 36. In addition, an ultrasound in December of 2016 indicated Plaintiff's common bile duct measured 10 mm in diameter. *Id.* at p. 34. More recently, an ultrasound from August of 2017 showed his bile duct dilated at "11-12 mm." Dkt. 190-1, p. 18. The report also stated that such a level of dilation "is not unexpected with the history of cholecystectomy."[3] *Id.* Plaintiff received an ultrasound in July of 2018, indicating his bile duct was dilated at "15 mm in diameter." *Id.* at p. 17. That report does not opine as to whether that level of dilation is normal or not. *See id.*

Defendants have provided evidence indicating that varying dilation of the bile duct is normal, even in healthy people, and that ERCP exams are used to identify blockages in the bile duct. Dkt. 58, Kroha Decl., ¶ 13. Further, Defendants' evidence indicates Plaintiff's various CT scans and ultrasounds did not show any blockage in his bile duct, and thus, an ERCP was unnecessary. *Id.* at ¶¶ 13-14. Plaintiff has provided evidence that a medical expert he hired in

---

[3] A cholecystectomy is the surgical removal of the gallbladder. <u>Steadmans Medical Dictionary</u> 169870 (2014).

2011 recommended he receive an ERCP if his bile duct dilation continued. *See* Dkt. 48-2, pp. 1-3. The expert also opined Plaintiff was "receiv[ing] good care[.]" *Id*. at p. 2.

Most recently, in March of 2018, Plaintiff filed a grievance requesting his methadone prescription be renewed and that he be provided with an ERCP. Dkt. 214-1, p. 14. That grievance was denied because Plaintiff's providers did not believe he was suffering from Sphincter of Oddi disorder, and Plaintiff was not otherwise suffering from any conditions that would require examination using ERCP. *Id*.

In July of 2018, Plaintiff filed another grievance requesting he be seen by a hepatologist for evaluation and that he be provided an ERCP. Dkt. 214-1, pp. 9-10. In response to the grievance, Non-Party Kevin Bovenkamp explained that Plaintiff's providers did not believe he suffered from any conditions that would require an ERCP. *Id.* at p. 10. As the ERCP was not medically necessary, Plaintiff's request was denied. *Id.* at p. 10.

On January 18, 2019, Plaintiff was taken to the hospital. Dkt. 214, p. 1. The physician that examined Plaintiff noted an ultrasound revealed Plaintiff had a "chronically dilated 15 mm common bile duct." Dkt. 243, p. 22. The physician noted Plaintiff "does need to undergo an MRCP[4] on an outpatient basis to evaluate [Plaintiff's common bile duct] dilation further and rule out a possible obstructive process." *Id*. at pp. 22-23. Plaintiff's pain was treated with Percocet and oxycodone. *Id.* at p. 23.

c.    Analysis

The Court interprets Plaintiff's allegations that he is not receiving adequate diagnostic treatment to allege Defendants provided inadequate treatment when they declined to provide

---

[4] An MRCP is a Magnetic resonance cholangiopancreatography and is an alternative to an ERCP. *See, e.g.*, *Reddick v. Lantz*, 2010 WL 1286992, at *2 (D. Conn. Mar. 29, 2010); *Jackson v. United States*, 469 F.Supp.2d, 1070 (M.D. Fla. Jan. 31, 2006).

Plaintiff with an ERCP. Defendants argue Plaintiff received adequate care even though they did not provide Plaintiff with an ERCP because there was no indication Plaintiff required an ERCP. Dkt. 177, p. 17. The undisputed evidence indicates Dr. Lopez stated Plaintiff had a dilated sphincter in his bile duct and that Sphincter of Oddi disorder was a possible diagnosis. The evidence also indicates Plaintiff's medical expert stated an ERCP may be necessary if his excessive dilation continues. However, the evidence shows that an ERCP is designed to identify blockages in a patient's bile duct. Medical staff made findings that an ERCP was unnecessary because Plaintiff had already undergone several ultrasounds indicating there was no blockage in his bile duct. Though Plaintiff has submitted evidence that outside providers have contradicted that finding, the record reflects Plaintiff received diagnostic treatment throughout his incarceration, including numerous ultrasounds, CT scans, and an examination by an infectious disease expert.

In sum, the evidence reflects Plaintiff did not receive an ERCP because the numerous ultrasounds and CT scans conducted by his medical providers indicated an ERCP was unnecessary. Though Plaintiff disagreed and continued to request ERCP testing and provided evidence that other medical providers suggested an ERCP, this evidence, at most, rises to a difference of medical opinion. A difference of medical opinion either between a prisoner and his physician, or between multiple physicians, does not rise to the level of deliberate indifference. *Franklin v. Oregon, State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Jackson*, 90 F.3d at 332. Further, a prisoner's lay medical opinion that he needs a particular treatment, without more, is insufficient to support medical deliberate indifference. *See Spicer v. Terhune*, 57 Fed. App'x 732, 733 (9th Cir. 2003) (a prisoner providing only his own medical opinion, without more, is insufficient to survive a motion for summary judgment); *Rogers v. Denkler*, 2001 WL 902554, at

*4 (N.D Cal. Aug. 2, 2001); *see also Calloway v. Kelley*, 2015 WL 4722976, at *21 (E.D. Cal. Aug. 7, 2015), subsequently aff'd sub nom. by *Calloway v. Kelly*, 733 F. App'x 910 (9th Cir. 2018). As Plaintiff has provided evidence showing only a difference in medical opinion, he has failed to show there is a genuine issue of material fact regarding his claim that he did not receive adequate diagnostic testing amounted to deliberate indifference.

### 2.  *Denial of Pain Management*

#### a.   Evidence in Plaintiff's Verified Complaint

Plaintiff next alleges he was denied access to necessary chronic pain medication. Dkt. 4, p. 12. Plaintiff states in his verified Complaint that he was previously on methadone for chronic pain management, but was inexplicably removed from the medication after he published his website in 2010. *Id.* Plaintiff alleges Defendant Hammond denied Plaintiff's request for resumption of narcotic pain management in 2016 because it is "not uncommon for patients with chronic pain to be dissatisfied with treatment offered by skilled and prudent medical providers." *Id.* at p. 13.

As noted above, Plaintiff alleges he was also denied treatment by Defendant Lauren. *See* Section III(A), *supra*. Plaintiff further states Defendant Lauren and Non-Party Ngo submitted a fraudulent request to the CRC, falsely indicating Plaintiff had a problem with narcotics. *Id.* at pp. 13-14. Plaintiff states that when he told Non-Party Dr. Fetroe of CBCC about the fraudulent submission, Dr. Fetroe submitted a second CRC request. *Id.* at p. 14. However, Defendant Hammond again denied his chronic pain medication "because [Plaintiff] would not remove [Defendants'] prior acts of wrongdoing violating the public's trust from his website." *Id.* He further argues that his attempts to appeal that denial were ineffective, and states that he is "prohibited from taking any type of NSAID pain relievers due to spontaneous bleeding they

cause" as a result of his liver condition. *Id.* at p. 15. Thus, Plaintiff ultimately states that, because Defendants will not provide him with narcotic pain medication and because he is otherwise prohibited from taking NSAIDs, Plaintiff is being denied any sort of pain management at all. *Id.* Plaintiff also contends his pain management was denied not because it was not medically necessary, but in retaliation for Plaintiff's actions. *Id.*

　　　　b.　Other Evidence on the Record

　　　　Initially, the record reflects that Plaintiff's medical expert, hired in 2011, diagnosed Plaintiff's chronic pain as "related to his chronic Hepatitis C." Dkt. 48-2, p. 1. That expert endorsed the care Plaintiff was receiving at that time, and cautioned against the use of narcotic medications because it "may contribute to hepatic encephalopathy." *Id.* at p. 2.

　　　　Plaintiff has provided evidence that he was on narcotic medication prior to August of 2014. *See* Dkt. 48-3, pp. 12, 28. However, he requested that the narcotic be changed because it appeared he was having an allergic reaction. *Id.* at p. 14. Defendant Kroha indicated there was "no substitute for oxycodone," but she would "try to get something else." *Id.* When Plaintiff requested he be placed on a different chronic opioid medication, the CRC denied his request, stating that it was not medically necessary because nothing substantive had changed in Plaintiff's case since his previous CRC review. *Id.* at p. 12. The CRC also noted Plaintiff had been on intermittent oxycodone and methadone between 2006 and 2012, and then gabapentin for chronic pain. *Id.* Though Defendant Kroha had presented the case to the CRC, she agreed with the denial, noting that "at this point [Plaintiff] has no indication for chronic opioid use for 'liver pain.'" Dkt. 48-3, p. 8. She also noted Plaintiff "will not get narcotics again until they are needed," and wrote that other medical staff agreed with that determination. *Id.*

Plaintiff has produced evidence that he sent a letter to Defendant Lauren on March 24, 2016, requesting additional pain treatment because his primary care provider had "only ordered blood tests," rather than provide any other care. Dkt. 48-3, p. 25. Defendant Lauren responded to that letter, stating that Plaintiff should refer to his primary care provider with any concerns. *Id*. at p. 24. He stated "[prior] to any further evaluation of [Plaintiff's] liver function or need for transplantation," Plaintiff's case would have to be heard by the CRC. *Id*. He also stated Plaintiff could request a referral to Dr. Lopez, an infectious disease specialist, if necessary. *Id*.

Plaintiff filed a grievance on March 26, 2016, addressing his chronic pain and also requesting to be placed on the liver transplant list. Dkt. 181-1, p. 69. Plaintiff was ultimately told that he would need to go through the CRC in order to receive the pain treatment he requested. *Id*. at p. 77.

It is undisputed that, on March 31, 2016, Plaintiff requested Dr. Lopez refer his case to the CRC for chronic opioid medication because he is unable to take NSAIDs given his history of liver disease. Dkt. 48-2, p. 35. Dr. Lopez stated Plaintiff's reported pain had an "unclear etiology" because cirrhotic livers should not cause such pain. *Id*. Although Dr. Lopez wrote that he believed the CRC would likely deny Plaintiff's request, he would present it to the CRC nonetheless. *Id*. Dr. Lopez wrote that, notwithstanding his pain, Plaintiff could engage in most of his daily activities, Plaintiff reported "sometimes the pain is so severe that he has to skip meals because he can't walk down/upstairs to go to main line." *Id*. at p. 32. On May 10, 2016, Non-Party Ngo examined Plaintiff. *See* Dkt. 57-1, p. 37. Non-Party Ngo noted that Plaintiff complained of chronic pain. *Id*. Plaintiff told Non-Party Ngo that Elavil[5] was not helping his

---

[5] Defendants indicate Elavil is a pain medication. Dkt. 177, p. 9.

pain and he wanted to stop taking it. *Id*. Non-Party Ngo also noted that Plaintiff cannot take NSAIDs due to his increased risk of GI bleeding. *Id*. He indicated he would present Plaintiff's case to the CRC. *Id*.

On May 18, 2016, after Non-Party Ngo presented Plaintiff's case to the CRC, the CRC determined that opioids for pain management were not medically necessary. Dkt. 48-3, p. 21. The CRC found that Plaintiff was given OxyContin while he was being treated for hepatitis, and "stated it was 'delightful' and since then has been wanting this medication." *Id*. The CRC also found Plaintiff has a "strong [history] of poly substance abuse," found that his opioid risk was "14-15,"[6] and proposed functional rehab as an alternative. *Id*. Plaintiff states the statement about his OxyContin use being "delightful" was a fabrication. Dkt. 4, p. 13; Dkt. 48-3, p. 58. Plaintiff filed a grievance stating the statement was "an outright lie" and indicating that he had, in fact, requested that OxyContin treatment be changed to a different narcotic treatment because he was having adverse side effects. Dkt. 48-3, p. 58. The superintendent of Plaintiff's facility found Plaintiff's allegations had merit – he stated Plaintiff had never been infracted for a drug related offense or submitted a urine test positive for narcotics, and the record indicated that he had a "pruritic response"[7] to the narcotics, though was able to tolerate them with food. Dkt. 48-3, p. 57. The superintendent indicated Plaintiff's case would be resubmitted to the CRC. *Id.*

On August 21, 2016, Plaintiff again requested chronic narcotic medication from Defendant Kroha. Dkt. 48-2, p. 38. Defendant Kroha noted Plaintiff could not take aspirin or NSAIDs because they caused bleeding and that Plaintiff had "no dirty UAs for 20 years." *Id*. On

---

[6] Defendants indicate "a risk of 8 is considered high." Dkt. 177, p. 9 (citing https://www.drugabuse.gov/sites/default/files/files/OpioidRiskTool.pdf).

[7] In this context, "pruritic" means "of, related to, or marked by itching." "Pruritic," *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/pruritic, last accessed February 5, 2019.

September 28, 2016, after Defendant Kroha presented Plaintiff's case to the CRC at Plaintiff's request, the CRC again denied Plaintiff's request for opioids for pain management. Dkt. 48-3, p. 18. The CRC noted Plaintiff's pain was not interfering with his activities of daily living. *Id*. It also noted Plaintiff was unable to take NSAIDs due to his platelet count, and could not take Tylenol because of the cirrhosis caused by his hepatitis. *Id*. The CRC found Plaintiff's opioid risk score to be "15." *Id*. Ultimately, the CRC again determined that chronic opioid medication was not medically necessary. *Id*. The record indicates that this was the most recent time the CRC reviewed Plaintiff's request for narcotic pain medication.

On September 30, 2016, Plaintiff filed a grievance challenging the CRC's determination. Dkt. 182-1, p. 51. He stated that, even though the statements regarding his prior drug use were proven false, the CRC still denied him narcotic pain management because of the alleged drug use. *Id*. He also wrote that his denial of medical treatment was because of his website. *Id*. That grievance was eventually administratively withdrawn because Plaintiff was instructed to rewrite it, but he failed to do so. *See id*. at pp. 51, 60.

On October 11, 2016, Plaintiff met with Defendant Kroha to discuss the CRC's most recent denial of his opioid pain medication. Dkt. 57-1, p. 39. Plaintiff agreed to "try Desipramine at night." *Id*. However, the Desipramine was discontinued the following month for "non-compliance." *Id*. at p. 40. Defendant Kroha also indicated she did not believe chronic opioid medications are necessary for Plaintiff's condition. *See* Dkt. 58, Kroha Decl., ¶ 11. She stated that a typical patient with Plaintiff's conditions would not need opioids or chronic narcotics because his conditions would not be expected to cause extreme pain. *Id.* Moreover, she stated Plaintiff did not appear to be in extreme pain when she examined him, and there were no objective signs that would indicate chronic narcotics are necessary. *Id*.

1    Defendant Kroha has provided evidence that, though she did not provide Plaintiff

2    narcotics and though Plaintiff could not use NSAIDs, she prescribed Plaintiff amitriptyline,

3    Cymbalta, and nortriptyline in response to Plaintiff's complaints of pain. Dkt. 58, Kroha Decl., ¶

4    11; Dkt. 58-1, p. 7. However, Plaintiff stopped taking the medications because of side effects.

5    Dkt. 58, Kroha Decl., ¶ 11; Dkt. 58-1, p. 7. Defendant Kroha maintains that, while she has tried

6    numerous non-narcotic medications to treat Plaintiff's chronic pain, he has consistently failed to

7    take them and instead insisted on narcotic pain medication. Dkt. 58, Kroha Decl., ¶ 11. The

8    record reflects Plaintiff has tried numerous chronic pain medications, but has stopped each of

9    them. Dkt. 58-1, p. 7. Further, Plaintiff has been prescribed numerous selective serotonin

10   reuptake inhibitors ("SSRI's"), although none of these were effective. For instance, he tried

11   amitriptyline for two weeks before stopping, and then changed to nortriptyline for two weeks

12   before stopping for "side effects." *Id*. The record also indicates Plaintiff was on Cymbalta in

13   April of 2017, which helped with nerve pain in Plaintiff's feet, but he was "i[t]ching a lot, and

14   red patches appear[ed] on [his] skin . . . and at times [he] hear[d] strange sounds." Dkt. 48-2, p.

15   14. The record shows Cymbalta did not help Plaintiff's "chronic liver pains/burning." *Id*. at p.

16   13. Defendant Kroha stopped the Cymbalta treatment in May of 2017. Dkt. 10. She offered to

17   discuss additional SSRIs with Non-Party Dr. Guidry to find a more effective treatment for

18   Plaintiff, but Plaintiff declined. Dkt. 58-1, p. 7.

19       In March of 2018, Plaintiff filed a grievance requesting his methadone prescription be

20   renewed and that he be provided with an ERCP. Dkt. 214-1, p. 14. That grievance was denied

21   because Plaintiff's providers did not believe he was suffering from Sphincter of Oddi disorder,

22   and Plaintiff was not otherwise suffering from any conditions that would require opioid pain

23   medication. *Id*. In July of 2018, Plaintiff filed another grievance requesting he be seen by a

24

1  hepatologist for evaluation and that he be provided an ERCP. Dkt. 214-1, pp. 9-10. Non-Party

2  Kevin Bovenkamp again explained that Plaintiff's providers did not believe he suffered from any

3  conditions that would require an ERCP, the ERCP was not medically necessary, and Plaintiff's

4  request was denied on that ground. *Id.* at p. 10. Plaintiff has also submitted evidence indicating

5  Non-Party Ngo prescribed him a narcotic pain medication, oxycodone, beginning October 15,

6  2018. Dkt. 207, p. 20.

7        Finally, Plaintiff has provided evidence that, on January 18, 2019, Plaintiff was taken to

8  the hospital. Dkt. 243; *see also* Dkt. 214, pp. 1-2. As noted above, an ultrasound showed

9  Plaintiff's common bile duct was chronically dilated to 15 mm. Dkt. 243, p. 22. The treating

10 physician noted Plaintiff "does need to undergo an MRCP on an outpatient basis to evaluate

11 [Plaintiff's common bile duct] dilation further and rule out a possible obstructive process." *Id.* at

12 pp. 22-23. Plaintiff's was given Percocet and oxycodone to treat his pain. *Id.* at p. 23.

13        c.    Analysis

14        Defendants contend Plaintiff received adequate medical treatment. *See* Dkt. 177.

15 Specifically regarding pain management, Defendants argue they denied Plaintiff narcotic

16 medication because he has a high risk for addiction and Defendants did not believe it was

17 necessary for Plaintiff's condition because a normal patient with Plaintiff's conditions would not

18 require a narcotic pain medication. Dkt. 177, p. 17. They assert Plaintiff has provided no

19 evidence that denial of narcotic pain medication was deliberately indifferent. *See id.* Plaintiff has

20 provided testimony in the form of his verified Complaint that Defendants knew he was

21

22

23

24

1  prohibited from using NSAID pain medication, and so denial of narcotics left Plaintiff "without

2  any type of pain management whatsoever." *See* Dkt. 4, p. 15.

3          However, the record indicates Plaintiff was, in fact, prescribed medication for his pain

4  management. The evidence shows Plaintiff was removed from his narcotic medication sometime

5  in 2014. He requested to be placed back on narcotics several times over the next several years,

6  but was consistently denied. Yet, during that time, Defendant Kroha prescribed Plaintiff with

7  numerous SSRIs to deal with Plaintiff's chronic pain. She provided him with amitriptyline,

8  nortriptyline, Cymbalta, and Desipramine, all of which Plaintiff stopped taking after a matter of

9  weeks because they were apparently ineffective or had adverse side effects. The record also

10  indicates Plaintiff was prescribed Elavil for his pain, which he stopped taking. The Court notes

11  that, read in the light most favorable to Plaintiff, the undisputed evidence shows Defendants'

12  attempts to manage Plaintiff's pain were largely ineffective. However, merely ineffective

13  prescription of pain medication, without more, is not sufficient to support a claim for medical

14  deliberate indifference. *See*, *e.g.*, *Blanco v. Duncan*, 2017 WL 2402456, at *7 (S.D. Cal. June 2,

15  2017) ("[E]ven accepting as true that all of the medications were ineffective at treating Plaintiff's

16  pain, this at best would only constitute mere negligence in treating Plaintiff's medical condition,

17  which is insufficient, as a matter of law, to constitute deliberate indifference"); *Nicholson v.*

18  *Finander*, 2015 WL 3935261, at *10 (C.D. Cal. June 26, 2015) (finding the prescription of an

19  SSRI for pain, though ultimately ineffective, was not deliberately indifferent because "a prison

20  official does not exhibit deliberate indifference to a serious medical need simply because she

21  prescribes a course of treatment that proves ineffective"); *see also Estelle*, 429 U.S. at 105-06

22  ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an

23  unnecessary and wanton infliction of pain[.]'").

24

1    The Court finds that Defendants have, in fact, provided Plaintiff with examinations and

2    medications in an attempt to manage his pain. Thus, insofar as Plaintiff alleges he was denied

3    any type of pain medication, the Court finds Plaintiff's has not shown a material question of fact

4    regarding the denial of pain medication.

5    Further, Plaintiff has not provided evidence that continuous narcotic treatment is

6    necessary at this time. Though the record reflects Plaintiff suffers from chronic pain, there are no

7    diagnoses indicating that narcotics are the only effective method to deal with that pain. Further,

8    the record indicates Plaintiff has received narcotic pain medication when deemed necessary by

9    medical professionals. Plaintiff has not provided any evidence, other than his own personal

10   opinion, that narcotics are the best method for managing his pain or are the only available

11   treatment that could ever control his pain. This is not enough to show a continuous narcotic

12   prescription is medically necessary for Plaintiff's condition. *See*, *e.g.*, *Shehee v. Nguyen*, 2018

13   WL 746405, at *7 (E.D. Cal. Feb. 7, 2018) (finding a prisoner's lay opinion about his medical

14   needs that differs from that of his doctors, without more, does not establish medical deliberate

15   indifference). Thus, insofar as Plaintiff alleges narcotics are the only way to sufficiently manage

16   his pain, Plaintiff has not provided medical evidence supporting that assertion.

17   In addition, the record does not show Defendants were deliberately indifferent when they

18   denied Plaintiff's narcotic medications. Defendants decided to not prescribe Plaintiff with

19   narcotic pain medications on several occasions. However, the record also reflects the CRC made

20   determinations that narcotic pain medication was not medically necessary. When the CRC

21   denied Plaintiff's request in 2014, it noted that the medication was not medically necessary based

22   on Plaintiff's conditions, and Defendant Kroha agreed with that determination. Defendant Kroha

23   noted Plaintiff had provided no indications for opioids treatment for "liver pain." When the CRC

24

denied Plaintiff's request for opioids in May of 2016, it did so because it found Plaintiff had a

high risk of addiction and a strong history of poly substance abuse. Similarly, when denying

Plaintiff's request for narcotics in September of 2016, the CRC again noted he had a high risk for

opioid addiction and noted that Plaintiff's pain was not affecting his activities of daily living.

Though Plaintiff disputes whether he has a history of drug use or is at a high risk for addiction,

that alone is insufficient to show the CRC's decision was medically unacceptable under the

circumstances or in conscious disregard for an excessive risk to Plaintiff's health. *See Toguchi v.*

*Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (a prisoner must show a provider's decision was

medically unacceptable under the circumstances or was chosen in conscious disregard to an

excessive risk to the prisoner's health in order to constitute deliberate indifference). Though

Plaintiff maintains that he requires opioid medications to treat his chronic pain rather than the

treatment he was being provided, such a request amounts to, at best, only a difference of medical

opinion. *Franklin*, 662 F.2d at 1344; *see*, *e.g.*, *Heggem v. Monroe Correctional Complex*, 2013

WL 2403258, at *7 (W.D. Wash. May 31, 2013) (finding dissatisfaction or disagreement with a

course of treatment is not enough to demonstrate deliberate indifference); *Woodroffe v. Oregon*,

2015 WL 2125908, at *5 (D. Ore. May 6, 2015) (noting prisoners are not constitutionally

entitled to medication they desire, only to medication that is a life necessity).

Hence, while Plaintiff does not agree with the denial of opioid medications, that is not

enough to support Defendants' deliberate indifference. *See Estelle*, 429 U.S. at 103; *Oppen v.*

*Phillips*, 2015 WL 1120125, at *5 (E.D. Wash. March 12, 2015) (finding failure to provide

*adequate* medical care, not failure to provide *desired* medical care, rises to the level of a

constitutional violation). Therefore, Plaintiff's disagreement with his care is not sufficient to

generate a dispute of material fact as to whether he received adequate care.

1     *3. Refusal to Evaluate for Liver Transplant*

2      a.   Evidence

3         Plaintiff alleges Defendants unlawfully failed to place Plaintiff on the list for a liver

4 transplant. He states in his verified Complaint that his MELD[8] score had reached 10, which

5 qualified him to be placed on the list. Dkt. 4, p. 16. He asserts he discussed receiving an

6 examination to be placed on the liver transplant list with Defendant Kroha, but did not hear

7 anything further. *Id*. He alleges Defendant Kroha failed to properly file the paperwork to get

8 Plaintiff a transplant and denies that his condition is improving. *Id*. at p. 18. Plaintiff also alleges

9 Defendant Hammond is responsible for failing to properly promulgate policies regarding the

10 transplant of organs. *Id*. at p. 17.

11         The record reflects that Plaintiff was evaluated for a liver transplant in December of

12 2014. Dkt. 48-3, p. 10. However, the transplant was denied because Plaintiff did not exhibit

13 "partial hypertension with recurrent bleeding from esophageal varices, gastric varices, NOT

14 recurrent infection . . . [and] NOT uncontrolled ascites." Dkt. 48-3, p. 10. At the time, Plaintiff's

15 MELD score was 9. *See id.* The record reflects that Plaintiff asked Defendant Lauren about a

16 liver transplant in March of 2016. Dkt. 48-3, p. 25. Defendant Lauren referred Plaintiff to his

17 primary care provider and noted he may be seen by an infectious disease expert. *Id*. at p. 24.

18         On March 26, 2016, Plaintiff filed a grievance indicating Non-Party Ngo had neglected to

19 adequately address his request for a liver transplant. Dkt. 181-1, p. 69. Defendant Maxson

20 responded that, as Defendant Lauren had already told Plaintiff, he must have his case presented

21 to the CRC before he will be able to receive a recommendation for a liver transplant. *Id*. On

22

23 ――――――――――――

24      [8] A MELD score is a tool used by practitioners to evaluate whether a patient is a good candidate for a liver transplant, and to track degradation of patients with liver disease. Dkt. 58, Kroha Decl., ¶ 6.

September 16. 2016, Plaintiff filed a grievance stating Defendant Kroha neglected to address his placement on the liver transplant list. Dkt. 182-1, p. 49. His grievance was denied because his MELD score of 10 did not yet qualify him for placement on the list. *Id*. at p. 50.

Plaintiff has produced evidence indicating his MELD score was taken in January 2016 and it was recorded at level 8. Dkt. 4, p. 43. Plaintiff's MELD score rose to 9 in April of 2017. Dkt. 48-2, p. 7. In September of 2018, Plaintiff alleged his MELD score had increased to 12. *See* Dkt. 174, p. 4. Defendants have provided evidence indicating that, pursuant to the standards promulgated by the American Association for the Study of Liver Diseases ("AASLD"), a MELD score of less than 15 is an "absolute contraindication" for a liver transplant. Dkt. 178-1, p. 107.

b.   Analysis

Here, Defendants argue Plaintiff was in fact examined for a liver transplant, but that he was denied because he did not meet the criteria. *See* Dkt. 177, pp. 7, 9, 17. The undisputed facts indicate Plaintiff was evaluated for a liver transplant in both 2014 and 2016 but was denied on both occasions. In 2014, he was denied because he did not exhibit the extrahepatic symptoms that would qualify him for a liver transplant. He was denied in 2016 because he requested the liver transplant in a grievance, but needed the CRC's permission before moving forward. In addition, his request for the liver transplant was denied in 2016 because his MELD score was at a 10, which did not qualify him for a liver transplant under the applicable standard of medical care.

Plaintiff claims that, because his MELD score was at 10, he was entitled to be placed on the list. However, the record explicitly contradicts this. Defendants have provided undisputed evidence that the AASLD states the standard of care is to provide liver transplants for patients with MELD scores of 15 or higher. Here, the record reflects Plaintiff's MELD score has never been 15 or higher. Based on this standard of care, Plaintiff presumptively was not yet eligible for

1   a liver transplant, and so the denial of a liver transplant on that basis does not show Defendants'

2   decision was medically unacceptable under the circumstances. *See*, *e.g.*, *Diaz v. Williams*, 2015

3   WL 1407305, at \*5-6 (N.D. Cal. March 27, 2015) (granting summary judgment and finding

4   prison officials were not deliberately indifferent when they denied a prisoner's liver transplant

5   based on a MELD score below 15).

6         In addition, the record does not reflect Plaintiff's liver conditions were unmonitored.

7   Rather, as explained in detail in Section III(B), Plaintiff underwent a variety of diagnostic

8   testing, including several ultrasounds and, as noted above, his MELD score was monitored. The

9   record indicates Defendants' decision not to provide Plaintiff with a liver transplant was based

10   on a medical determination that he did not yet exhibit the symptoms that would indicate he

11   requires a liver transplant. Though Plaintiff disagreed with that determination, the record

12   indicates his disagreement is merely a difference of medical opinion that does not rise to the

13   level of medical deliberate indifference. *See Jackson*, 90 F.3d at 332. Therefore, the Court

14   concludes there is no dispute of material fact regarding the claim that Defendants' acted with

15   deliberate indifference to Plaintiff's request for a liver transplant.

16         c.  *Conclusion*

17         For the reasons stated above, the Court finds there is no dispute of material facts as to

18   Plaintiff's Eighth Amendment claims, and even reading the undisputed facts in the light most

19   favorable to Plaintiff, he has not shown his Eighth Amendment rights were otherwise violated.

20   Therefore, Plaintiff's Eighth Amendment claims should be dismissed.

21         D.  <u>Retaliation Claims</u>

22         Plaintiff alleges Defendants violated his First Amendment rights by retaliating against

23   him because he failed to remove unflattering information about Defendants from a website he

24

began publishing in 2010. *See* Dkt. 4, pp. 19-28. To prevail on a retaliation claim, a plaintiff

must prove the defendant retaliated against him for exercising a constitutional right and the

retaliatory action did not advance legitimate penological goals or was not narrowly tailored to

achieve such goals. *Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997). A prisoner suing a prison

official under § 1983 for retaliation must allege "the type of activity he engaged in was protected

under the first amendment and that the state impermissibly infringed on his right to engage in the

protected activity." *Rizzo v. Dawson,* 778 F.2d 527 (9th Cir. 1983)*.*

> Within the prison context, a viable claim of First Amendment retaliation entails five
> basic elements: (1) An assertion that a state actor took some adverse action against
> an inmate (2) because of (3) that prisoner's protected conduct, and that such action
> (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action
> did not reasonably advance a legitimate correctional goal.

*Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

First, the Ninth Circuit has noted that the "mere *threat* of harm can be an adverse action,

regardless of whether it is carried out because the threat itself can have a chilling effect."

*Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (emphasis in original). Second, to

determine whether a defendant's actions were "because of" a prisoner's protected conduct, the

Court may examine either direct or circumstantial evidence, including the timing of the alleged

adverse action, a defendant's expressed opposition to Plaintiff's speech, or "other evidence that

the reasons proffered by the [defendant] for the adverse . . . action were false and pretextual."

*McCollum v. California Dep't of Corr. and Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (quoting

*Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002)). Third, Plaintiff must show that the

conduct against which Defendants allegedly retaliated was, in fact, protected conduct. *See*

*Brodheim*, 584 F.3d at 1269.

Fourth, Plaintiff need not demonstrate the adverse action actually chilled his ability to

engage in protected conduct because "[t]o hold otherwise 'would be unjust' as it would 'allow a

defendant to escape liability for a First Amendment violation merely because an unusually

determined plaintiff persists in his protected activity.'" *Brodheim*, 584 F.3d at 1271 (quoting

*Rhodes*, 408 F.3d at 568-59). Rather, Plaintiff must show the adverse action "'would chill *or*

silence a person of ordinary firmness from future First amendment activities.'" *Id*. (quoting

*Rhodes*, 408 F.3d at 168-69) (emphasis in original). Finally, Plaintiff must show the challenged

action "'did not reasonably advance a legitimate correctional goal.'" *Brodheim*, 584 F.3d at 1271

(quoting *Rhode*, 408 F.3d at 568).

### 1. Retaliation Claim as to Defendant Jewitt

Plaintiff alleges Defendant Jewitt retaliated against Plaintiff as a result of DOC

information Plaintiff posted on his website. Dkt. 4, pp. 23-24. Plaintiff has provided testimony

that, in 2016, Defendant Jewitt told Plaintiff he would "not do a thing for" Plaintiff because of

Plaintiff's website. *Id.* at p. 23. Plaintiff states that he told Defendant Jewitt "he was in the

process of removing all DOC medical personnel from his website." Dkt. 4, p. 23. However, the

record reflects that Defendant Jewitt's only interaction with Plaintiff was in regard to a medical

opinion he rendered on Plaintiff's mental state after an alleged infraction. In April of 2016,

Plaintiff was placed in the special offender unit ("SOU") after breaking several windows as well

as a television in his cell. Dkt. 178-1, p. 10. After evaluating Plaintiff, Defendant Jewitt

recommended Plaintiff be placed in the SOU and given mental health medication for 72 hours.

Dkt. 179, Jewitt Decl., ¶ 6. After that time, Defendant Jewitt re-evaluated Plaintiff and

recommended he be returned to general population. *Id*. at ¶ 7. When contacted for the later

infraction hearing, Defendant Jewitt stated he could not give a definitive medical opinion

regarding Plaintiff's mental state at the time of the incident given the brevity of his encounter

with Plaintiff. Dkt. 180-1, p.2. As such, the pending infractions for the destruction of property

were dismissed. Dkt. 180-1, p. 2. Defendant Jewitt also submitted a sworn statement that he was

unaware of Plaintiff's website at the time he saw Plaintiff in April 2016. *See* Dkt. 179, Jewitt

Decl., ¶ 9.

Therefore, the record reflects Defendant Jewitt was only involved in Plaintiff's medical

care for the mental evaluation he conducted and testimony he provided at Plaintiff's infraction

hearing. But Plaintiff has provided no allegations or testimony purporting that Defendant Jewitt

acted unreasonably or in a retaliatory manner in recommending Plaintiff be placed in the SOU

and given medication for 72 hours. *See* Dkt. 4, pp. 23-24. In addition, the record reflects Plaintiff

was found not guilty of the infraction, in part, because of Defendant Jewitt's inability to provide

a definitive medical opinion as to Plaintiff's mental state. Thus, Plaintiff failed to provide

evidence showing there is a genuine issue of material fact regarding whether Defendant Jewitt

took an adverse action against Plaintiff because he engaged in protected conduct.

Further, there is no material question of fact regarding whether Defendant Jewitt was

motivated by Plaintiff's protected conduct. Plaintiff's testimony states he told Defendant Jewitt

he was in the process of removing the information from his website, but Defendant Jewitt failed

to provide him care. *Id.* at p. 23. However, Plaintiff has only provided conclusory allegations

Defendant Jewitt knew of Plaintiff's website. *See id.* Defendant Jewitt, on the other hand,

submitted a sworn statement that he did not know of Plaintiff's website at the time, and has never

viewed the website. Plaintiff has not included testimony that would allow a reasonable juror to

infer Defendant Jewitt's was actions were motivated by Plaintiff's protected conduct. *See See*

*Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014) (citations omitted) ("mere speculation that

defendants acted out of retaliation is not sufficient" to prevail on a First Amendment retaliation

claim); *Watts v. Ruggiero*, 2016 WL 916233, at *20 (E.D. Cal. March 20, 2016) (finding no

1    reasonable juror could find retaliatory intent when a prisoner's speculation was rebutted by a

2    defendant's sworn statement). Hence, Plaintiff has not rebutted Defendant Jewitt's showing that

3    he took no adverse action against Plaintiff and was not motivated by Plaintiff's protected

4    conduct. Accordingly, Plaintiff has failed to show there is a genuine issue of material fact

5    remaining regarding the retaliation claim against Defendant Jewitt.

6        *2.  Retaliation Claim as to Defendant Hammond*

7        Plaintiff also alleges a retaliation claim against Defendant Hammond. Dkt. 4, pp. 14, 19-

8    20. Specifically, Plaintiff asserts Defendant Hammond voted to deny Plaintiff's pain

9    management request in 2016 "because [Plaintiff] would not remove [his] prior acts of

10   wrongdoing violating the public's trust from his website." Dkt. 4, p. 14. However, Plaintiff has

11   not provided any other information in his Complaint supporting Defendant Hammond's

12   allegedly retaliatory motive in 2016. He has generally asserted Defendant Hammond provided

13   inadequate care based on Plaintiff publishing information on his website, but has not provided

14   more. Plaintiff has only provided speculation as to Defendant Hammond's retaliatory motive.

15   *See Wood*, 753 F.3d at 905; *see also Watts*, 2016 WL 916233, at *20 (speculation is insufficient

16   to establish retaliatory motive for purposes of summary judgment). To survive summary

17   judgment, Plaintiff must produce actual evidence that raises his claims above mere speculation,

18   not mere allegations. Therefore, based on the record before the Court, Plaintiff's allegation

19   against Defendant Hammond amounts to nothing more than speculation. Accordingly, Plaintiff

20   has failed to show there is a genuine issue of material fact regarding the retaliation claims against

21   Defendant Hammond.

22

23

24

1          *3.   Retaliation as to Defendant Kroha*

2          In responding to Plaintiff's retaliation claims, Defendants argue the actions of Defendant

3  Kroha did not amount to retaliation. *See* Dkt. 177, p. 21. However, in reviewing Plaintiff's

4  Complaint, the Court cannot identify a retaliation claim against Defendant Kroha. Rather, the

5  claims Plaintiff asserts against Defendant Kroha are limited only to failure to provide adequate

6  medical care, which the Court has already addressed. *See* Section III(C), *supra*. As Plaintiff has

7  failed to show there is a genuine issue of material fact regarding the retaliation claim against

8  Defendant Kroha, the Court recommends any retaliation claim against Defendant Kroha be

9  dismissed.

10         *4.   Retaliation Claims as to Defendants Maxson and Holthe*

11         Plaintiff alleges Defendants Maxson and Holthe each retaliated against him by failing to

12  adequately process several of Plaintiff's grievances. *See* Dkt. 4, pp. 15, 25-28. Plaintiff asserts

13  Defendants Maxson and Holthe received Plaintiff's grievances that included, amongst other

14  complaints, his allegations that DOC staff were retaliating against him because of his website.

15  *See id.* He states they retaliated against him by requiring him to rewrite the grievances by

16  omitting references to his retaliation allegations. *Id*. at pp. 25-28.

17         Thus, Plaintiff claims retaliatory action from Defendant Maxson and Defendant Holthe

18  based on their alleged refusal to accept and process his grievances. *See id.* However, with respect

19  to retaliatory motive, Plaintiff merely alleges Defendant Maxson and Defendant Holthe's failure

20  to process his grievances constituted "retaliatory animus, contrary to the First and Fourteenth

21  Amendments." Dkt. 4, p. 28.

22         Contrary to Plaintiff's conclusory allegation, the record shows Defendants did not decline

23  to process his grievances or deny his grievances *because of* protected conduct. For example, in

24

1  instructing Plaintiff to rewrite a grievance involving medical issues, Defendant Maxson noted:

2  "Stay on topic. Original complaint was only about wanting outside treatment for biliary

3  duct/liver issue. You included many other medical issues not included in previous complaints[.]"

4  Dkt. 181-1, p. 74. When Plaintiff failed to rewrite, the record shows Defendant Maxson

5  requested Plaintiff file a rewritten grievance because his initial grievance "was solely about [his]

6  desire to gain outside review of [his] medical case," and Plaintiff had included unrelated

7  information in his grievance. *Id.* at p. 75. Once Plaintiff rewrote his grievance and focused only

8  on the information he initially raised in his initial grievance, Defendant Maxson accepted his

9  appeal. *Id.* at p. 76. In declining to process another grievance from Plaintiff, Defendant Holthe

10  stated Plaintiff's complaint "was withdrawn per [his] request and therefore will not be re-

11  open[ed]." Dkt. 182-1, p. 7. In a different grievance, Defendant Holthe required Plaintiff to

12  rewrite a grievance because it contained alleged statements from a staff person who had retired,

13  was therefore considered hearsay, and was not grievable. *Id.* at p. 33. However, once Plaintiff

14  rewrote the grievance, Defendant Holthe processed it. *Id.* at p. 34.

15      The Court finds Plaintiff has not provided evidence indicating Defendants Maxson or

16  Holthe denied Plaintiff's grievances *because of* protected conduct. Plaintiff's allegation that the

17  denial of his grievances and requirement to rewrite them constitutes retaliatory motive alone is

18  not enough. *See Richey v. Dahne*, 733 Fed. App'x 881, 884 (9th Cir. 2018) ("Neither [the Ninth

19  Circuit's] prior case law nor that of the Supreme Court has clearly established that merely

20  refusing to accept a grievance for processing is a retaliatory adverse action."); *Kakatin v. Kiaina*,

21  2015 WL 9460119, at *5 (D. Haw. Dec. 23, 2015) (finding the denial of a grievance, without

22  more, not sufficient to state a claim for retaliation). Therefore, even reading the facts in the light

23  most favorable to Plaintiff, the record does not show Defendants Maxson or Holthe denied his

24

1    grievances or required him to rewrite his grievances because of Plaintiff's protected conduct.

2    Accordingly, Plaintiff has failed to show there is a genuine issue of material fact regarding the

3    retaliation claims against Defendant Maxson and Defendant Holthe.

4            *5.  Retaliation Claims as to Defendants Thrasher, Herzog, and Campbell*

5            Finally, Plaintiff alleges Defendants Thrasher, Herzog, and Campbell retaliated against

6    him when he refused to remove information from his website. Dkt. 4, pp. 21-23, 24-25. He states

7    they retaliated against him by moving him between various levels of custody classification and to

8    different facilities in order to disrupt his medical treatment. *See id.*

9            The record indicates that Plaintiff was moved between facilities several times during his

10   incarceration. Specifically, Plaintiff was initially transferred to the Clallam Bay Corrections

11   Center ("CBCC") in March of 2014. Dkt. 4, p. 21. However, because CBCC was not located

12   near medical facilities, Plaintiff requested a transfer. *Id*. He alleges Defendant Thrasher

13   interviewed Plaintiff in January of 2015 and indicated he would only be transferred if he

14   "remove[d] all DOC personnel from [his] website." *Id*. at p. 22. Plaintiff states that "despite

15   having minimum custody points and a formal recommendation for a medical transfer,"

16   Defendant Herzog denied the request at Defendant Thrasher's direction. *Id*.

17           Initially, the record indicates that the decision not to transfer Plaintiff in January of 2015

18   was made by various non-party DOC personnel. "When opposing parties tell two different

19   stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

20   believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for

21   summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Here, Plaintiff's assertion that he

22   was denied a transfer by Defendants Herzog and Thrasher in 2015 is blatantly contradicted by

23   the record because the record indicates various other non-party DOC personnel made the

24

1   determination not to transfer Plaintiff. Therefore, the Court need not accept Plaintiff's assertion

2   as true for purposes of this Motion, and finds there is no dispute of material fact on Plaintiff's

3   allegations as to the January 2015 transfer decision. *See Scott*, 550 U.S. at 380.

4       In addition, Plaintiff alleges he was held in close custody after the incident in which he

5   broke several windows and his television. Dkt. 4, pp. 24-25. Plaintiff alleges Defendants

6   Thrasher, Herzog, and Campbell made that decision in order to disrupt Plaintiff's medical care in

7   retaliation for him posting information on his website. *Id*. Plaintiff filed an appeal requesting a

8   change out of close custody, which was denied. *Id*. Plaintiff was also allegedly recommended for

9   a classification promotion in October of 2016, which was allegedly denied by Defendant Herzog

10  at the recommendation of Defendants Campbell and Thrasher. *Id*. at p. 25.

11      It is not disputed Plaintiff was demoted after an infraction hearing following the incident

12  in which Plaintiff broke several windows and a television. *See* Dkt. 4, p. 24; Dkt. 177, pp. 4-5. In

13  Defendants' Motion, Defendants argue Plaintiff's demotion was not based on any sort of

14  retaliatory motive but rather on Plaintiff's behavior. Dkt. 177, p. 22. Here, Plaintiff has not

15  provided testimony in his Complaint or other evidence showing he was demoted for retaliatory

16  purposes. He states generally that Defendants "acted with retaliatory animus to ensure he does

17  not receive appropriate medical care and medications . . . because he has not removed the DOC

18  medical providers from his website." Dkt. 4, p. 25. However, Plaintiff has not shown he was

19  threatened or that Defendants Thrasher, Herzog, and Campbell had retaliatory motive. Even

20  reading the facts in the light most favorable to Plaintiff, his testimony that his transfer was

21  approved after he agreed to remove information from his website does not have a sufficient

22  causal nexus to the decision to actually change Plaintiff's classification. Plaintiff's allegations

23  here amount only to speculation, which is insufficient to survive summary judgment. *See Wood*,

24

1  753 F.3d at 905; *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011)

2  (specific evidence of retaliation is required to survive summary judgment).

3       It is also not disputed that Defendant Herzog, despite a recommendation from staff at

4  CBCC, denied Plaintiff's promotion and maintained him in close custody in October of 2016.

5  *See* Dkt. 48-2, pp. 52-53. Defendants argue Plaintiff's promotion was denied, not due to some

6  retaliatory animus, but because Plaintiff had only been in close custody for four months since the

7  earlier incident. Dkt. 177, p. 22. However, the evidence showing that Defendant Herzog was the

8  Defendant who denied Plaintiff's promotion does not contain any reasoning for the decision.

9  Rather, it simply states "Per . . . Robert Herzog on 11/18/16: Maintain close custody." *See* Dkt.

10  48-2, p. 53.

11       The Court finds Plaintiff has not shown that Defendant Herzog's actions were based on a

12  retaliatory motive. Again, Plaintiff merely alleges in his Complaint he was not promoted

13  "because he had not removed the DOC medical providers from his website." Dkt. 4, p. 25.

14  Plaintiff has not provided specific evidence Defendant Herzog had retaliatory motive in

15  transferring Plaintiff. Plaintiff's allegations here amount only to speculation. In order to survive

16  summary judgment, Plaintiff must produce evidence that brings his claims beyond the realm of

17  speculation. *See Wood*, 753 F.3d at 905. The Court finds the record here does not bring these

18  claims beyond the mere speculation produced by Plaintiff's conclusory allegations. Therefore,

19  Plaintiff has failed to show there is a genuine issue of material fact regarding the retaliation

20  claims against Defendants Thrasher, Herzog, and Campbell.[9]

21

22

23       [9] As the Court finds Plaintiff has failed to overcome Defendants' showing that no genuine issue of material fact remains in this case, the Court declines to consider Defendants' qualified immunity argument raised in the

24  Motion. *See* Dkt. 177.

1    **IV.    Conclusion**

2    Based on the foregoing, the Court concludes Defendant's Motion (Dkt. 177) should be

3    granted. The Court also finds Plaintiff has not properly substituted a successor for Defendant

4    Lauren following Defendants' filing of the Statement Noting Death of Kenneth Lauren and has

5    not properly stated a claim for relief which can be granted as to Defendant Awad. Thus, the

6    Court recommends the claims against Defendants Lauren and Awad be dismissed.

7    As Plaintiff has an interlocutory appeal currently pending before the Ninth Circuit in this

8    case, the Court recommends the Honorable Ronald B. Leighton, the District Judge assigned to

9    this case, enter an order on this Report and Recommendation following the Ninth Circuit's

10    decision and issuance of a mandate on the current appeal. Because the Court finds summary

11    judgment should be granted in Defendants' favor and the case should be closed, the Court

12    declines to consider any documents filed by the parties other than objections to this Report and

13    Recommendation.

14    If the Court adopts the undersigned's Report and Recommendation, leave to proceed *in*

15    *forma pauperis* for purposes of appeal may be denied if the appeal is frivolous or taken in bad

16    faith. *Hooker v. American Airlines*, 302 F.3d 1091, 1092 (9th Cir. 2002); 28 U.S.C. § 1915(a)(3).

17    The undersigned recommends Plaintiff be denied leave to proceed *in forma pauperis* for purpose

18    of appeal, because any appeal of the Court's order would be frivolous or taken in bad faith.

19    Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

20    fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

21    6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

22    review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit

23

24

imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on May 17, 2019, as noted in the caption.

Dated this 2nd day of May, 2019.

David W. Christel
United States Magistrate Judge